UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AARON VRH,<br><br>    Plaintiff,<br><br>  v.<br><br>NICHOLE GORDIAN, *et al.*,<br><br>    Defendants. | Case No. 1:24-cv-01248-JLT-EPG (PC)<br><br>FINDINGS AND RECOMMENDATIONS, RECOMMENDING THAT THIS CASE PROCEED ONLY ON PLAINTIFF'S CLAIMS CONCERNING: (1) VIOLATION OF HIS RIGHT TO BE FREE FROM UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT AGAINST DEFENDANT GORDIAN; (2) RETALIATION AGAINST DEFENDANTS DUNAS, GENSEAL, AND DE LA GARZA; (3) DELIBERATE INDIFFERENCE TO HIS SERIOUS MEDICAL NEEDS AGAINST DEFENDANTS DR. SHIN, NURSE ANDERSON, NURSE JOHNSON, DR. LONGIA, AND DR. BANSAL; (4) AND DENIAL OF DUE PROCESS AGAINST DEFENDANTS RAMIREZ, GUZMAN, AND ANDRADE.<br><br>(ECF NO. 18)<br><br>OBJECTIONS, IF ANY, DUE WITHIN THIRTY (30) DAYS |

Plaintiff Aaron Vrh, a state prisoner, proceeds *pro se* in this civil rights action filed under 42 U.S.C. § 1983.[1] In his first amended complaint, Plaintiff sues sixteen prison officials, alleging that they forced him to work when he was physically unable to do so, retaliated against him, denied him medical care, and denied him due process in connection with his prison

---

[1] Plaintiff paid the filing fee and is not proceeding *in forma pauperis* in this case. (*See* December 2, 2024 docket entry).

1

disciplinary proceedings and loss of his personal property. (ECF No. 18).

After reviewing the amended complaint, the Court recommends permitting Plaintiff to proceed only on the following claims: (1) violation of his right to be free from unconstitutional conditions of confinement against Defendant Gordian; (2) retaliation against Defendants Dunas, Genseal, and De La Garza; (3) deliberate indifference to his serious medical needs against Defendants Dr. Shin, Nurse Anderson, Nurse Johnson, Dr. Longia, and Dr. Bansal; and (4) denial of due process against Defendants Ramirez, Guzman, and Andrade.

## I. SCREENING REQUIREMENT

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or officer or employee of a governmental entity. 28 U.S.C. § 1915A(a). The Court must dismiss a complaint, or part of it, if the prisoner raises claims that are frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(b)(1), (2).

A complaint is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A plaintiff must set forth "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570). The mere possibility of misconduct falls short of meeting this plausibility standard. *Id.* at 679. While a plaintiff's allegations are taken as true, courts "are not required to indulge unwarranted inferences." *Doe I v. Wal-Mart Stores, Inc.*, 572 F.3d 677, 681 (9th Cir. 2009) (citation and internal quotation marks omitted). Additionally, a plaintiff's legal conclusions are not accepted as true. *Iqbal*, 556 U.S. at 678.

Pleadings of *pro se* plaintiffs "must be held to less stringent standards than formal pleadings drafted by lawyers." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010) (holding that *pro se* complaints should continue to be liberally construed after *Iqbal*).

\\\

2

## II.    FIRST SCREENING ORDER

Plaintiff filed the original complaint in this case on October 15, 2024.  (ECF No. 1). The Court screened Plaintiff's initial complaint and determined that he stated only the following claims: (1) violation of his right to be free from unconstitutional conditions of confinement against Defendant Gordian; (2) retaliation against Defendants Dunas, Genseal, and De La Garza; (3) deliberate indifference to his serious medical needs against Defendants Dr. Shin, Nurse Anderson, Nurse Johnson, Dr. Longia, and Dr. Bansal; and (4) denial of due process against Defendants Ramirez, Guzman, and Andrade. (ECF No. 17, pp. 30-31). The Court reviewed the legal standards for Plaintiff's claims and noted where he failed to provide sufficient facts to assert such claims. The screening order gave Plaintiff thirty days to notify the Court that he wanted to proceed on only his cognizable claims, file an amended complaint, or notify the Court that he wanted to stand on his complaint and have it reviewed by a District Judge.

Plaintiff filed a response to the screening order, stating that "for the most part," he "wish[ed] to proceed based on the findings of the Court."[2] (ECF No. 19, p. 1). However, he noted that believed that he had "to file an amended complaint to comply with the required act of stating [how] each Defendant acted under color of state law." (*Id.*). The only analysis that Plaintiff challenges in the screening order concerns his due process claims regarding the deprivation of his personal property. (*Id.* at 2).

Also in his response to the screening order, Plaintiff states that he could not rewrite his complaint in the thirty days provided to file an amended complaint, so he planned "to resubmit the original complaint as a first amended complaint with corrections and additions." (*Id.* at 1-2).

## III.    SUMMARY OF PLAINTIFF'S FIRST AMENDED COMPLAINT

Plaintiff filed his first amended complaint on April 23, 2025. (ECF No. 18).[3]

---

[2] For readability, the Court has made minor alterations to some of Plaintiff's quotations—such as correcting misspellings and altering punctuation—without indicating each change.

[3] The Court notes that Plaintiff's first amended complaint is almost word-for-word the same as his original complaint. The material differences between the original and first amended complaints are (1) Plaintiff has reordered some of the pages (*compare* ECF No. 1, p. 5, *with* ECF No. 18, p. 7); (2) Plaintiff has added allegations throughout the first amended complaint that Defendants acted under color of state

In that amended complaint, Plaintiff states that the events described occurred at Valley State Prison (VSP). He names sixteen persons, all VSP employees, as Defendants: (1) Vocational Teacher Nichole Gordian; (2) Counselor L. Zaragoza; (3) Chief Medical Officer Dr. H. Longia; (4) Primary Care Physician Dr. Manu Bansal; (5) Nurse Debbie Anderson;[4] (6) Dr. Ellen Shin; (7) Nurse Genia Raylynn Walker; (8) Nurse Practitioner Patricia Johnson; (9) Correctional Officer Lt. J. Guzman; (10) Correctional Officer Lt. M. Ramirez; (11) Correctional Officer H. Moseley; (12) Assistant Warden M. Dotson; (13) Correctional Sergeant De La Garza; (14) Correctional Officer R. Genseal; (15) Correctional Officer Mr. Dunas; and (16) Correctional Officer Lt. A. Andrade.

The complaint either identifies, or implicates, the following legal claims: (1) unconstitutional conditions of confinement and denial of medical care in violation of the Eighth Amendment; (2) retaliation in violation of the First Amendment; and (3) violations of due process as protected by the Fourteenth Amendment.

Plaintiff's allegations will be discussed in more detail below. However, his claims generally stem from his contention that, upon his arrival at VSP, he was forced to work even though he was physically incapable of performing his assignments. This started a series of events that form the basis for his remaining claims. For example, he was retaliated against after seeking a medical excuse to avoid work assignments and was denied medical care for his conditions. Further, he asserts that certain Defendants lost or damaged his property in retaliation for his complaints and denied him due process in connection with his property and rule violation report (RVR) proceedings.

As for relief, Plaintiff requests monetary damages and various forms of injunctive relief.[5]

_____

law; e.g., he states "N. Gordian acted under color of state law as CDCR staff," (ECF No. 18, p. 14);[3] and (3) he eliminates references to violations of the Americans with Disabilities Act (ADA), the Rehabilitation Act (RHA), and his equal protection rights, which are claims that the Court concluded did not survive screening (compare ECF No. 1, p. 4, with ECF No. 18, p. 6; see ECF No. 17, pp. 26-29).
[4] Plaintiff alternatively refers to her as "Andersen." The Court will use "Anderson" for consistency.
[5] The Court notes that Plaintiff's first amended complaint is difficult to follow at times because it often

III.    **ANALYSIS OF PLAINTIFF'S FIRST AMENDED COMPLAINT**

A.    **Section 1983**

The Civil Rights Act under which this action was filed provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983. "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see also Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 618 (1979); *Hall v. City of Los Angeles*, 697 F.3d 1059, 1068 (9th Cir. 2012); *Crowley v. Nevada*, 678 F.3d 730, 734 (9th Cir. 2012); *Anderson v. Warner*, 451 F.3d 1063, 1067 (9th Cir. 2006).

To state a claim under § 1983, a plaintiff must allege that (1) the defendant acted under color of state law, and (2) the defendant deprived him of rights secured by the Constitution or federal law. *Long v. County of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006); *see also Marsh v. County of San Diego*, 680 F.3d 1148, 1158 (9th Cir. 2012) (discussing "under color of state law"). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark County Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)). "The requisite causal connection may be established when an official sets in motion a 'series of acts by others which the actor knows or reasonably should know would cause others to inflict' constitutional harms."

---

"incorporates" factual allegations from different parts of his first amended complaint, meaning that the facts for any single claim are often scattered throughout the first amended complaint rather than contained in one section. The Court has, as best as it can follow the first amended complaint, addressed Plaintiff's claims and material allegations. However, the Court will not address isolated references, *e.g.*, to "slander and defamation," to legal authority that does not appear to be at issue in this case. (ECF No. 18, p. 9).

*Preschooler II*, 479 F.3d at 1183 (quoting *Johnson*, 588 F.2d at 743). This standard of causation "closely resembles the standard 'foreseeability' formulation of proximate cause." *Arnold v. Int'l Bus. Mach. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *see also Harper v. City of Los Angeles*, 533 F.3d 1010, 1026 (9th Cir. 2008).

A plaintiff must demonstrate that each named defendant personally participated in the deprivation of his rights. *Iqbal*, 556 U.S. at 676-77. In other words, there must be an actual connection or link between the actions of the defendants and the deprivation alleged to have been suffered by the plaintiff. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691, 695 (1978).

**B.    Conditions of Confinement – Eighth Amendment**

All of Plaintiff's claims stem from his allegation that he was forced to work when he was physically unable to do so. Such allegations implicate a claim of being subjected to unconstitutional conditions of confinement.

"It is undisputed that the treatment a prisoner receives in prison and the conditions under which [the prisoner] is confined are subject to scrutiny under the Eighth Amendment." *Helling v. McKinney*, 509 U.S. 25, 31 (1993); *see also Farmer v. Brennan*, 511 U.S. 825, 832 (1994). "In prohibiting cruel and unusual punishment, the Eighth Amendment imposes a duty on prison officials to 'provide humane conditions of confinement . . . and [to] take reasonable measures to guarantee the safety of the inmates.'" *Denney v. Redwood City*, No. C 95-2148 CAL, 1995 WL 494592, at *1 (N.D. Cal. Aug. 7, 1995) (quoting *Farmer*, 511 U.S. at 832). Conditions of confinement may, consistent with the Constitution, be restrictive and harsh. *See Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006); *Osolinski v. Kane*, 92 F.3d 934, 937 (9th Cir. 1996); *Jordan v. Gardner*, 986 F.2d 1521, 1531 (9th Cir. 1993) (en banc). Prison officials must, however, provide prisoners with "food, clothing, shelter, sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d 1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S. 472 (1995); *see also Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000);

*Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982); *Wright v. Rushen*, 642 F.2d 1129, 1132-33 (9th Cir. 1981).

Two requirements must be met to show an Eighth Amendment violation. *Farmer*, 511 U.S. at 834. "First, the deprivation must be, objectively, sufficiently serious." *Id.* (internal quotation marks and citation omitted). Second, "prison officials must have a sufficiently culpable state of mind," which for conditions-of-confinement claims, "is one of deliberate indifference." *Id.* (internal quotation marks and citation omitted). Prison officials act with deliberate indifference when they know of and disregard an excessive risk to inmate health or safety; notably the prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

"A prisoner's labor can constitute a condition of confinement, where the prisoner has no choice but to work in some capacity within the prison." *Morgan v. Morgensen*, 465 F.3d 1041, 1045 (9th Cir. 2006). "More specifically, the Eighth Amendment is implicated in the prison work context only when a prisoner employee alleges that a prison official compelled him to 'perform physical labor which [was] beyond [his] strength, endanger[ed his life] or health, or cause[d] undue pain.'" *Id.* at 1045 (quoting *Berry v. Bunnell*, 39 F.3d 1056, 1057 (9th Cir. 1994) (per curiam) (alterations in original).

Moreover, this Court bears in mind the Supreme Court's instruction that "[r]unning a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources" and thus courts should "accord deference to the appropriate prison authorities" who are tasked with "prison administration." *Turner v. Safley*, 482 U.S. 78, 84-85 (1987). Relying on such guidance, the Ninth Circuit has afforded deference to prison authorities in the context of prison job assignments. *Gates v. Rowland*, 39 F.3d 1439, 1448 (9th Cir. 1994) ("Under the standard of review announced in *Turner*, deference is due to the prison authorities' policy not to open food service jobs to HIV-infected inmates."); *see Leon v. Vasquez*, No. 1:11-CV-00601-LJO, 2011 WL 4353124, at *2 (E.D. Cal. Sept. 16, 2011)

("[P]articular job assignments of prisoners are matters of prison administration in which federal courts should not interfere.").

In his First Amended Complaint, Plaintiff asserts that he is permanently and completely disabled, having suffered spinal injuries from automobile accidents. (ECF No. 18, p. 5). Because of his injuries, CDCR doctors "have issued multiple medical restriction chronos," including limitations on him lifting, standing, sitting, and making repetitive motions. (*Id.*). Further, he is supposed to lie down every 1-2 hours if needed. (*Id.*). And based on such limitations, Plaintiff has been excused from school and work assignments at other prisons, including being "given a six-month lay-in doctors excuse." (*Id.*).

When Plaintiff arrived at VSP, he agreed to take some college classes and stay out of trouble. (*Id.*). He was told that, if he did so, he would not be given an assignment. (*Id.*). He enrolled in college on November 29, 2022, and was notified on December 22, 2022, that he had "a VOC vocational assignment." (*Id.*). Plaintiff made a request to be removed from his assignment to his vocational teacher, Defendant Nichole Gordian, Counselor L. Zaragoza, and medical staff. (*Id.*). After receiving no response, he thought he had been removed from his assignment. (*Id.*). However, about a month later, he was notified he had to go to class and was instructed to get a "lay-in medical excuse" for his injuries and a medical chrono. (*Id.*). Plaintiff thought his prior six-month lay-in was valid but was informed it was not. (*Id.*).

Plaintiff alleges that, in the events that followed, Gordian required him to complete work assignments that he was restricted from doing despite Gordian knowing that these tasks caused him pain and suffering. (*Id.* at 6, 11). Among other things, Plaintiff states that he showed Gordian the same documentation he had showed another VOC teacher at a prior prison, which teacher had accommodated him by allowing him to check in and then leave class until the assignment department could remove him. (*Id.* at 11). However, Gordian "forc[ed] [him] to do the assignment duties" that a medical doctor restricted him from doing. (*Id.*). More specifically, he was forced to go to class and "sit or stand for over two hours and perform repetitive hand/arm movements." (*Id.*). Plaintiff suffered from being forced to complete assignments, including experiencing painful throbs in his body and getting dizzy, ultimately

requiring him to have to lay on the floor (in an incident that he later refers to as going "man-down"). (*Id.* at 12, 14).

Further, he states that Gordian knew about, but ignored, medical advice that he not be forced to complete assignments. (*Id.* at 12). For example, Plaintiff described an incident where he tried to provide Gordian "with updated medical documentation" but "she refused to look at [it]." (*Id.*). Further, she refused to acknowledge the permanency of his spinal condition and that he had "been issued multiple lay-ins before and after attending her class," and instead "demanded [Plaintiff] go do exactly what [he is] medically restricted from doing." (*Id.* at 14). Moreover, Gordian generally responded to his complaints by accusing him of faking his condition and disputing whether he was in fact medically restricted from performing work assignments. (*Id.* at 14-15). Ultimately, Gordian issued him an RVR for refusing to work or participate in a work/training program. (*Id.* at 14).

Liberally construing the above allegations for purposes of screening, the Court concludes that Plaintiff's First Amended Complaint has stated a claim for unconstitutional conditions of confinement against Gordian.

## C. Retaliation

Plaintiff alleges that certain Defendants retaliated against him, mostly because he complained about their conduct.

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567–68 (9th Cir. 2005) (footnote and citations omitted). To prevail on a retaliation claim, a plaintiff may "assert an injury no more tangible than a chilling effect on First Amendment rights." *Brodheim v. Cry*, 584 F.3d 1262, 1269-70 (9th Cir. 2009). Furthermore, "a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'"

*Id.* at 1271 (citing *Rhodes*, 408 F.3d at 568–69) (emphasis in original). "Evidence of his motive may include: (1) proximity in time between the protected conduct and the alleged retaliation; (2) defendant's expressed opposition to the protected conduct; and (3) other evidence showing that defendant's reasons for the challenged action were false or pretextual." *Barth v. Montejo*, No. 2:19-CV-1874 DB P, 2020 WL 73407, at *2 (E.D. Cal. Jan. 7, 2020).

While prisoners have no freestanding right to a prison grievance process, *see Ramirez v. Galaza,* 334 F.3d 850, 860 (9th Cir. 2003), "a prisoner's fundamental right of access to the courts hinges on his ability to access the prison grievance system," *Bradley v. Hall,* 64 F.3d 1276, 1279 (9th Cir. 1995), *overruled on other grounds by Shaw v. Murphy,* 532 U.S. 223, 230 n.2 (2001). Because filing administrative grievances and complaining about misconduct are protected activities, it is impermissible for prison officials to retaliate against prisoners for engaging in these activities. *Rhodes,* 408 F.3d at 567; *Uribe v. McKesson*, No. 08CV01285 DMS NLS, 2011 WL 9640, at *12 (E.D. Cal. Jan. 3, 2011) ("An inmate's reporting of officer misconduct, or the attempt to do so verbally or in writing, constitutes speech or conduct entitled to First Amendment protection.").

### 1. Gordian and L. Zaragoza

The Defendants who allegedly retaliated against Plaintiff fall into three categories: (1) Gordian, who as discussed above was Plaintiff's vocational teacher, and L. Zaragoza, a counselor; (2) Defendants that were involved in Plaintiff's medical care (*i.e.*, Medical Defendants); and (3) Defendants working in a correctional capacity (*i.e.*, Correctional Defendants). The Court begins with the allegations against Gordian and Zaragoza.

As noted above, Plaintiff alleges that Gordian forced him to work beyond his physical abilities, despite Plaintiff trying to convince her that his multiple medical issues prevented him from working. Plaintiff describes an incident where he experienced medical symptoms— including pain and dizziness—that caused him to have to lay on the floor and wait for Medical to arrive. (ECF No. 18, p. 12). Thereafter, Plaintiff states, "Gordian wrote me an RVR for having a medical emergency in retaliation for arguing with her about my medical restrictions." (*Id.*).

Additionally, he claims that on April 3, 2023, he "refused to go do what caused [him] to go man down on 3/23/23 and was attempting to present Ms. Gordian with new updated medical documentation & she refused to look at them the made false accusations that [he] blocked her doorway." (*Id.*). This led to another RVR. (*Id.*). Plaintiff asserts that, he received four RVRs in total "stemming from [his] ADA condition and manipulation of medical documents and records as retaliation." (*Id.*). Plaintiff indicates that he filed a grievance against Gordian, but the timing of the grievance in relation to the allegations is unclear.

As to Zaragoza, the complaint provides fewer allegations. Plaintiff states that Zaragoza is a counselor and one of the persons whom Plaintiff requested to be removed from his work assignment based on his medical conditions. (*Id.* at 5). Generally, Plaintiff indicates that Zaragoza retaliated against him by refusing to start the process to remove him from his work assignment because Zaragoza claimed that it was Gordian's responsibility to start the process. (*Id.* at 16). However, Gordian claimed it was Zaragoza's responsibility, with both Gordian and Zaragoza admitting to being in contact with the other. (*Id.*). Later, Gordian and Zaragoza claimed it was Dr. Bansal's responsibility to start the process, who in turn refused claiming it was Zaragoza's responsibility. (*Id.*).

Upon considering Plaintiff's allegations and the relevant legal standards, the Court concludes that Plaintiff fails to state a claim against either Defendant. As to Zaragoza, while Plaintiff generally accuses Zaragoza of retaliation by failing to start the process of removing him from his work assignment, he fails to specify any protected conduct he engaged in, *e.g.*, that he filed a grievance against Zaragoza. Moreover, he does not allege facts demonstrating that Zaragoza failed to start the process of removing him from his work assignment based on any protected conduct.

As to Gordian, Plaintiff alleges that he did complain about her conduct—including by filing a grievance against her—and he received false RVRs. However, while it appears that some of Gordian's conduct could have occurred after the time of Plaintiff's complaints, the simple fact that Plaintiff allegedly suffered retaliatory action sometime after he complained is not enough to show that Gordian engaged in misconduct because of Plaintiff's speech. *See*

1    *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir. 1995) (noting that "timing can properly be

2    considered as circumstantial evidence of retaliatory intent" but there was "little else to support

3    the inference" in that case); *see also Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir.

4    2000) (concluding that retaliation cannot rest on "the logical fallacy of post hoc, ergo propter

5    hoc, literally, 'after this, therefore because of this.'"). Importantly, Plaintiff fails to provide

6    additional facts that would indicate that Gordian filed an RVR against him because he

7    complained, rather than due to the fact that Plaintiff failed to do his work assignments. And it is

8    not clear from the complaint that Gordian even knew about his complaints when she allegedly

9    retaliated against Plaintiff.

10         Accordingly, Plaintiff fails to state a retaliation claim against Gordian and Zaragoza.

11                                   **2.  Medical Defendants**

12         As discussed above, one of Plaintiff's allegations is that, to avoid work assignments, he

13   needed to obtain a "lay-in medical excuse" and "medical chrono." (ECF No. 18, p. 5). Plaintiff

14   went to Defendant Genia Walker, a nurse, for this purpose but she refused to provide him a

15   "lay-in" and laughed at him "in a childish bully demeanor." (*Id.*). She also accused him of

16   "faking" his condition in front of the C Yard Medical Clinic. (*Id.* at 10). Plaintiff states that this

17   is when the retaliation began, as Walker told another unspecified nurse that he was faking his

18   condition as they walked back into the clinic. (*Id.*).

19         Plaintiff says "[a]bout this same time period" he complained to the medical board about

20   Defendant Ellen Shin, a doctor, because she discontinued wet wipes that he had received on a

21   permanent basis at another facility based on his incontinence. (*Id.*). He describes an incident

22   where Dr. Shin laughed at him and told him that she could prescribe him diapers, with Plaintiff

23   then walking out of the tele-med appointment. (*Id.*). Additionally, Dr. Shin "fail[ed] to tell

24   [Plaintiff] to not take Naproxen" before being transported 300 miles while shackled. (*Id.*).

25   Apparently related to this incident, Plaintiff states elsewhere that Dr. Shin failed to properly

26   communicate with Plaintiff and a spine specialist, who was going to perform epidurals on

27   Plaintiff, about the requirements and status of Plaintiff's medication and treatments. (*Id.* at 20).

28   As a result, Plaintiff was needlessly transported to the spine specialist multiple times, with the

spine specialist ultimately being unable to treat him due to Dr. Shin's failure to competently communicate medical information. (*Id.* at 21). Plaintiff was transported over 2000 miles before one epidural was administered. (*Id.*). He states that inmates call these "torture runs," meaning inmates are submitted to painful medical transportation multiple times to deter them from requesting care. (*Id.*). And Plaintiff spinal condition worsened due to his transportation. (*Id.*).

Plaintiff reported Walker and Shin to Defendant Dr. H. Longia, the Chief Medical Officer and their supervisor, and filed a 602 grievance on January 20, 2023, and multiple others. (*Id.* at 10). And Plaintiff filed a complaint with the medical board—presumably against Walker and Shin—that "they[6] responded to" on February 10, 2023, and filed another complaint on February 12, 2023. (*Id.*).

Plaintiff asserts that medical records show a "morning huddle" where unspecified medical staff get together and "collude[] as to treatment of inmates." (*Id.*). He asserts that it became obvious that a rumor was spread through medical staff that he was faking his condition, as multiple staff told him so, including Defendant Debbie Anderson, a nurse.  (*Id.*).

On February 10, 2023, Defendant Patricia Johnson, a nurse practitioner, removed all of his medical restrictions from his chrono after a brief tele-med appointment where she claimed that she wanted to put him in a wheelchair. (*Id.*). Elsewhere, Plaintiff indicates that these restrictions included special cuffing or waist chains, bottom bunk only, and no stairs. (*Id.* at 21). Plaintiff explained that his condition would worsen if he did not have a walker (thus indicating that Johnson had something to do with his walker being taken away) to help him walk as therapy. (*Id.* at 10). But Johnson removed his medical restrictions that had been put in effect by qualified doctors and she failed to notify him as required under Cal. Code Regs. tit. 15, § 3999.320(b)(2).[7] (*Id.*).

---

[6] Presumably, "they" means the Medical Board rather than any Defendant.
[7] This provision states that, a medical classification chrono shall be issued "[w]henever the patient's medical condition changes in a way that would change their medical classification." Cal. Code Regs. tit. 15, § 3999.320(b)(2). To the extent that Plaintiff is attempting to bring a claim based on this prison regulation allegedly being violated, he is advised that violations of prison regulations do no *per se* equate to constitutional violations. *See Powell v. Banales*, No. 19-CV-06753-JST, 2019 WL 5626272, at

13

On February 21, 2023, Anderson took his walker and accused him of faking his condition. (*Id.*). When Plaintiff told her that she was not qualified to take his walker, she told him that she could leave him with a cane, and that it would just take one phone call to Dr. Shin. (*Id.*). Plaintiff argued that he could not fake medical evidence—such as neurologist reports— but was issued an RVR. (*Id.*). Plaintiff appears to refer to this RVR elsewhere, stating that when he said he could not fake medical evidence, Anderson "hit her alarm button then wrote" a RVR resulting in disciplinary proceedings where he was found not guilty. (*Id.* at 20). Anderson called Dr. Shin and had his walker taken away, which Plaintiff contends "shows plotted collusion to retaliate." (*Id.* at 10).

An unidentified sergeant issued Plaintiff a temporary wheelchair that he was not able to push while sitting because of his spinal condition. (*Id.* at 10-11). Further, he could not walk behind the wheelchair because it was unable to support his weight without "doing a wheelie and collapsing" when his legs buckled, which happens often, and in fact did happen later. (*Id.* at 11).

On February 22, 2023, Dr. Shin refused to return Plaintiff's walker. (*Id.*). While most wheelchair bound inmates have an assigned ADA inmate worker to push them, staff refused to assign Plaintiff one because the wheelchair was temporary. (*Id.*). Plaintiff was unable to push himself by using his arms, leaving him with the only option of walking behind the wheelchair, which resulted in a fall and injury. (*Id.*).

When Plaintiff "reported the retaliation" to Dr. Longia, he failed to stop his "subordinates misfeasance." (*Id.*).

After Plaintiff reported Anderson's actions to the Medical Board, she tried to take his walker two more times after it was returned to him and made permanent by the Reasonable Accommodations Committee. (*Id.*).

After considering Plaintiff's allegations and the relevant legal standards, the Court concludes that Plaintiff fails to state a claim against any of the Medical Defendants. Summed

---

*2 (N.D. Cal. Oct. 30, 2019) ("Not every violation of a state prison regulation rises to the level of a constitutional violation.").

up, Plaintiff accuses the Medical Defendants of taking various adverse actions regarding his medical care because of his complaints. However, Plaintiff has failed to provide facts indicating that the Medical Defendants knew about the complaints and took action against him because of such complaints.

For example, Plaintiff states that Walker refused to provide him a "lay-in" and accused him of faking his condition. However, he does not provide any facts that she did so because he complained about her, and the context of the complaint suggests that he did not in fact complain about her until after this event.

True, some of the timing here, could suggest retaliation by some Defendants. For example, Plaintiff indicates that he filed at least one grievance against Dr. Shin in January 2023, and he thereafter complains that Dr. Shin took actions he disagreed with, such as taking his walker away. However, as noted above, the simple fact that Plaintiff allegedly suffered retaliatory action sometime after he complained is not enough to show that Defendants engaged in misconduct because of Plaintiff's speech. *See Pratt*, 65 F.3d at 808,

Moreover, there are not sufficient allegations that the Defendants were even aware of his complaints. For example, Plaintiff states that he reported Anderson's actions to the medical board, but does not provide any allegations that she knew about his complaint before trying to take his walker away. *See Rojo v. Paramo*, No. 13CV2237 LAB BGS, 2014 WL 2586904, at *5 (S.D. Cal. June 10, 2014) ("As currently pleaded, the Court finds Plaintiff's claims of retaliation fail to state a plausible claim for relief because they are based on an unsupported assumption that Dr. Garikaparthi knew about Plaintiff's alleged complaint to the medical board . . . .").

Lastly, as to Dr. Longia, the only allegations appear to be that Dr. Longia failed to take action when the other Medical Defendants, who were Dr. Longia's subordinates, took actions that Plaintiff disagreed with. However, supervisory personnel are not liable under § 1983 for the actions of their employees under a theory of *respondeat superior* and, therefore, when a named defendant holds a supervisory position, the causal link between the supervisory defendant and the claimed constitutional violation must be specifically alleged. *Iqbal*, 556 U.S.

at 676-77; *Fayle v. Stapley*, 607 F.2d 858, 862 (9th Cir. 1979); *Mosher v. Saalfeld*, 589 F.2d 438, 441 (9th Cir. 1978). To state a claim for relief under section 1983 based on a theory of supervisory liability, a plaintiff must allege some facts that would support a claim that the supervisory defendants either: were personally involved in the alleged deprivation of constitutional rights, *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989); "knew of the violations and failed to act to prevent them," *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); or promulgated or "implement[ed] a policy so deficient that the policy itself is a repudiation of constitutional rights and is the moving force of the constitutional violation," *Hansen*, 885 F.2d at 646 (citations and internal quotation marks omitted). There are not sufficient facts here suggesting that Dr. Longia can be liable for the other Medical Defendants' alleged retaliation, especially since Plaintiff has failed to successfully allege retaliation by any of the Medical Defendants.

Thus, Plaintiff fails to state a retaliation claim against any of the Medical Defendants.

### 3. Correctional Defendants

Plaintiff's final set of retaliation allegations are directed towards Defendants employed as correctional staff at VSP. His allegations fall into two categories: (1) allegations concerning RVR proceedings; and (2) allegations concerning his personal property.

#### a. RVR proceedings

As noted above, Plaintiff complains that Gordian wrote false RVRs against him. Plaintiff claims that his due process rights were violated by Defendants Guzman and Ramirez during his RVR proceedings. (ECF No. 18, p. 12). Accordingly, he filed grievances against Guzman, Ramirez, and Gordian. (*Id.*).

In turn, Plaintiff asserts that Defendants Moseley and Dotson responded to his grievances in a manner that violated state law. (*Id.*). Thereafter, Moseley and Dotson retaliated against Plaintiff by making false accusations that he made a threat against VSP staff. (*Id.*). Plaintiff asserts that he was not making a threat; rather, he had overhead inmates wanting to assault "the canteen lady" because of her behavior towards the inmates and he submitted a grievance reporting this "safety issue." (*Id.* at 17). However, the Grievance Department made

the ridiculous claim that this grievance was a threat. (*Id.*). Plaintiff believes "this was an excuse used as a tool by [the] VSP grievances office to retaliate against [him] for reporting" state law violations by Dotson and Moseley to the Office of Appeals, the Office of Internal Affairs, and the Office of the Inspector General. (*Id.*). He states that he was placed in administrative segregation because of the alleged threat he made; however, he was ultimately found not to be a security threat. (*Id.* at 13).

As with Plaintiff's retaliation claims made above, Plaintiff fails to state a claim. Notably, although he asserts that Moseley and Dotson retaliated against him—purportedly because he filed grievances against them—he provides no facts showing that they made false allegations that he threatened VSP staff because of such grievances.

Thus, Plaintiff fails to state a retaliation claim against Moseley and Dotson.

### b. Personal property

Plaintiff indicates that, because he was taken to administrative segregation, his property was taken and ultimately lost or damaged. (ECF No. 18, p. 13). He alleges that Defendants Dunas and Genseal mishandled the removal of his property in retaliation for his complaints; further, he states that Defendant De La Garza said he could not get his property because he had filed a grievance. (*Id.* at 7, 13).

On July 17, 2023, Plaintiff was taken to administrative segregation with no explanation. (*Id.* at 7). He requested to be allowed to lock his locker and was told by Dunas not to worry because they (meaning Dunas and Genseal) would pack up his property. (*Id.*). Later, VSP staff would claim they were not liable for the loss of his property because his locker was unlocked. (*Id.*). Plaintiff asked why he was being handcuffed and Dunas responded with something to the effect of, "you will find out soon," "well you keep writing all those 602s." (*Id.*).

After being placed in the holding cage, Plaintiff asked an officer what was going on. (*Id.*). She replied, "What do you expect is going to happen when you write all those 602s? You did the same thing at High Desert and now you're doing it here." (*Id.*). Elsewhere, Plaintiff states that multiple officers asked if he was going to continue filing 602s and/or acted surprised when he requested a 602 grievance form. (*Id.* at 13). He states that he has filed 49 grievances.

(*Id.*).

Plaintiff was escorted out of the Program Office in handcuffs and without his reading glasses. (*Id.* at 17). A cart full of sealed boxes was brought to him and he was told to sign a 1080 form to verify his property. (*Id.*). However, Plaintiff could not read the form or see in the boxes, so he argued with Dunas, who assured him that all of his property was in the boxes. (*Id.*). Dunas told him to sign or all his property would be taken to R&R, and who knows what would happen to it there. (*Id.*). Plaintiff was able to identify one box of legal documents with a 21-day deadline due pending, so under duress, he signed the document and was escorted to administrative segregation. (*Id.*).

After being found not guilty of threatening staff, his property boxes were returned while he was housed on the A yard. (*Id.*). He discovered that a bunch of his property was missing and his typewriter was damaged and missing the keyboard cover. (*Id.*). Plaintiff was sent back to C Yard the next day but housed in a different building.  (*Id.*).

He inventoried his property and questioned the inmates in the cell he had been housed in when his property had been boxed up. (*Id.*). The inmates said that, after Dunas obtained his "Durable Medical Equipment," he told the inmates that "we don't care about the rest of the stuff" and allowed the inmates access to his property by involving them in packing and moving it into the dayroom where the officers packed it into boxes. (*Id.* at 17-18). Inmate Halpert said that nobody took Plaintiff's property in his presence, but when he returned from taking some of the property to the dayroom, Plaintiff's typewriter was on the floor and broken into three pieces. (*Id.* at 18). Plaintiff says that his typewriter still works but will not last long due to a missing keyboard cover. (*Id.*).

He also states that his TV was missing and listed as confiscated. (*Id.*). It was wrongfully taken because it was a "payout TV," *i.e.*, a replacement TV when officers are found responsible for an inmate's property. (*Id.*). The TV had another inmate's name on it, but that was crossed out when Plaintiff received the TV as a payout for a TV that was broken when Plaintiff was transported to a different prison. (*Id.*). Despite this procedure being common and the TV being on his property list, Dunas and Genseal took it because it had another inmate's name on it.

18

(*Id.*).

      When Plaintiff saw Dunas, he questioned him about his missing property and what was happening with the payout status of the TV. (*Id.*). Dunas claimed he would look into it and acted surprised about the amount of the missing property that was not on the confiscation slip. (*Id.*). When Plaintiff saw Dunas again, he claimed that the TV "was still at R&R where he turned it in and that boxes" of Plaintiff's property had accidently been sent to R&R and Dunas would get it. (*Id.*).

      Weeks passed and Dunas kept making excuses about why he had not retrieved Plaintiff's property. Dunas instructed Plaintiff to speak to his supervisor, Defendant De La Garza. (*Id.*). Plaintiff asserts that De La Garza made the false claim that he could not get his property from R&R because he had filed a 602 grievance when he returned to C Yard. (*Id.*).

      Plaintiff was interviewed by a sergeant about his missing property 602, and Genseal and Dunas were instructed to retrieve his property from R&R. (*Id.* at 19). However, Dunas claimed that all his property was missing at R&R. (*Id.*). Dunas and Genseal called Plaintiff into the building where he was previously housed while the entire building was at Chow Hall. (*Id.*). They took him into a tiny room with no cameras. (*Id.*). They had a replacement TV, empty plastic bin, and one extension cord totaling about $285. (*Id.*). They claimed they would replace all of Plaintiff's missing property, but he rejected the offer, leading them to threaten to claim that Plaintiff possessed stolen speakers from the visiting building, which Plaintiff did not have. (*Id.*). Plaintiff refused their offer because he still had hundreds of dollars of missing property and a broken typewriter that was not accounted for. (*Id.*).

      During the period when Dunas was making excuses for not having retrieved his property from R&R, Plaintiff sent a request form to R&R asking to be allowed to retrieve his property. (*Id.*). However, a sergeant responded that Plaintiff's property had never been at R&R. (*Id.*). Plaintiff asserts that another sergeant offered to replace as much of the lost property as he could, but this never happened. (*Id.*). He contends that he has at least $785 of missing or damaged property. (*Id.*).

      Upon review, the Court concludes that, for the purposes of screening, Plaintiff has

19

provided sufficient allegations to state a retaliation claim against Dunas, Genseal, and De La Garza.

### D.    Deliberate Indifference to Serious Medical Needs

Plaintiff includes allegations against various Defendants about his medical care that implicate a claim that they were deliberately indifferent to his serious medical needs.

"[T]o maintain an Eighth Amendment claim based on prison medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This requires Plaintiff to show (1) "a 'serious medical need' by demonstrating that 'failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain,'" and (2) that "the defendant's response to the need was deliberately indifferent." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)), *overruled on other grounds by WMX Technologies v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (*en banc*).

Deliberate indifference is established only where the defendant subjectively "knows of and disregards an excessive risk to inmate health and safety." *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (citation omitted). Deliberate indifference can be established "by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett*, 439 F.3d at 1096 (citation omitted). Civil recklessness (failure "to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known") is insufficient to establish an Eighth Amendment violation. *Farmer*, 511 U.S. at 836-37 & n.5 (1994) (citations omitted).

A difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). To establish a difference of opinion rising to the level of deliberate indifference, a "plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances." *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996).

Plaintiff's allegations here overlap to some extent with his allegations concerning his retaliation claims against the Medical Defendants.[8] As to Nurse Walker, Plaintiff states that she told other VSP staff that he was faking his medical condition to get out of attending class. (ECF No. 18, p. 9).

Dr. Shin "fail[ed] to tell [Plaintiff] to not take Naproxen" before being transported 300 miles while shackled. (*Id.* at 10). Apparently related to this incident, Plaintiff states elsewhere that Dr. Shin failed to properly communicate with Plaintiff and a spine specialist, who was going to performing epidurals on Plaintiff, about the requirements and status of Plaintiff's medication and treatments. (*Id.* at 20). As a result, Plaintiff was needlessly transported to the spine specialist multiple times, who could not treat him due to Dr. Shin's failure to communicate medical information. (*Id.* at 21). Plaintiff was transported over 2000 miles before one epidural was administered. (*Id.*). Describing these trips as "torture runs," he says inmates are subjected to painful medical transportation multiple times to deter them from requesting care. (*Id.*). And Plaintiff spinal condition worsened due to his transportation. (*Id.*).

Nurse Anderson orchestrated the taking of his walker, which resulted in his fall and injury. (*Id.* at 9). Plaintiff recounts an incident on February 21, 2023, where he rolled across the basketball court while sitting in his "walker" without previously being warned not to do so. (*Id.*). Anderson came out of the yard yelling at him in an unprofessional manner, stating that she could take his walker and leave him with a cane. (*Id.*). Plaintiff explained that nobody had told him that he could not sit and roll. (*Id.*). When Plaintiff told her that she was not qualified to take his walker, she told him that she could leave him with a cane, and that it would just take one phone call to Dr. Shin. (*Id.* at 10). Plaintiff argued that he could not fake medical evidence—such as neurologist reports. (*Id.*). Anderson called Dr. Shin and had his walker taken away, and Dr. Shin refused to return his walker on February 22, 2023. (*Id.* at 10-11). He states

---

[8] Plaintiff briefly asserts that "Gordian was deliberately indifferent to [his] medical needs and physical restrictions when she forced [him] to perform . . . restricted duties." (ECF No. 18, p. 6). However, this is not a claim for deliberate indifference to medical needs because Gordian did not delay or deny Plaintiff medical care. Rather, as discussed above, such allegations relate to Plaintiff's conditions of confinement, and the Court has allowed this claim to proceed against Gordian.

that Anderson also had a different nurse backdate a fake document stating that she had warned him previously not to roll on the walker. (*Id.* at 20).

Plaintiff asserts that he had problems with his prescription refill requests being unaccounted for until Anderson was moved off the yard clinic to the main medical building. (*Id.* at 11). Plaintiff contends that he eventually did fall and suffered from reduced mobility by not having his walker, which walker was eventually returned to him and made permanent by another doctor. (*Id.* at 20).

Nurse Johnson removed all of his medical restrictions from his chrono on February 10, 2023, after a brief tele-med appointment where she claimed that she wanted to put him in a wheelchair. (*Id.* at 10). Elsewhere, Plaintiff indicates that these restrictions included special cuffing or waist chains, bottom bunk only, and no stairs. (*Id.* at 21). Plaintiff explained that his condition would worsen if he did not have a walker (thus indicating that Johnson had something to do with his walker being taken away) to help him walk as therapy. (*Id.* at 10). But Johnson removed his medical restrictions that had been put in effect by qualified doctors and she failed to notify him as required under a prison regulation. (*Id.*).

Later, when Plaintiff had a spinal misalignment causing inflammation and a pinched nerve, he requested an icepack, which was a simple cure that had worked for these symptoms in the past. (*Id.* at 21). A "subordinate nurse" of Johnson's saw Plaintiff and gave him a pamphlet recommending an icepack and stating that she could not provide one without her supervisor's approval. (*Id.*). However, Johnson refused to provide him an icepack and generally disregarded his pain.

Additionally, Dr. Longia later refused icepacks in response to Plaintiff's request for a reasonable accommodation, ignoring Plaintiff's medical condition and pain. (*Id.*).

Dr. Bansal "was negligent by failing to provide adequate medical lay ins for [Plaintiff] to not attend [] Gordian's class for a known to be permanent medical condition." (*Id.* at 22). Plaintiff indicates that Dr. Bansal wrote temporary lay-ins previously, showing that he was aware of Plaintiff's medical restrictions, but later claimed it was not his responsibility to start the process to remove him from the class, despite acknowledging that "it was needed." (*Id.*).

Eventually, Plaintiff was removed from his assignment, his restrictions that had been removed were reinstated, and he has been classified as totally disabled. (*Id.*).

Liberally construing Plaintiff's allegations, the Court concludes that they are sufficient to state claims of deliberate indifference to Plaintiff serious medical needs against Defendants Dr. Shin, Nurse Anderson, Nurse Johnson, Dr. Longia, and Dr. Bansal, as all these Defendants allegedly acted with deliberate indifference concerning their involvement in denying or delaying Plaintiff medical care that ultimately caused him pain or injury.

However, the Court concludes that Plaintiff fails to state a claim against Nurse Walker. Unlike the other Defendants, Plaintiff does not identify any medical need that Walker refused to provide or delayed. Rather, he generally alleges that she started a false rumor that he was faking his medical conditions.

### E.      Due Process – RVR Proceedings

Plaintiff alleges due process violations in connection with his RVR proceedings.

The Due Process Clause of the Fourteenth Amendment prohibits states from depriving individuals of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause protects prisoners from being deprived of liberty without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). To state a cause of action for deprivation of procedural due process, a plaintiff must first establish the existence of a liberty interest for which the protection is sought. Liberty interests may arise from the Due Process Clause itself or from state law. *Hewitt v. Helms*, 459 U.S. 460, 466–68 (1983). With respect to liberty interests arising from state law, the existence of a liberty interest created by prison regulations is determined by focusing on the nature of the deprivation. *Sandin v. Conner*, 515 U.S. 472, 481–84 (1995). Liberty interests created by prison regulations are limited to freedom from restraint which "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.* at 484.

Additionally, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolff*, 418 at 556. The minimum procedural protections prison officials must provide an inmate facing

disciplinary charges are: (1) a written notice of the charges at least 24 hours before the disciplinary hearing; (2) a written statement by the factfinders detailing the evidence relied upon and the reasons for the disciplinary action; (3) the right for the inmate to call witnesses and present documentary evidence, unless doing so would be unduly hazardous to institutional safety or correctional goals; and (4) assistance where the issues presented are complex or the inmate is illiterate. *See id.* at 564–70. "Some evidence" must also support the hearing officer's decision, and the evidence must have some indicia of reliability. *Superintendent v. Hill*, 472 U.S. 445, 455 (1985); *accord Cato v. Rushen*, 824 F.2d 703, 705 (9th Cir. 1987). The "some evidence" standard is minimally stringent, and the relevant inquiry is whether "there is any evidence in the record that could support the conclusion reached." *Hill*, 472 U.S. at 455–56.

These protections "adhere only when the disciplinary action implicates a protected liberty interest in some 'unexpected matter' or imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Serrano v. Francis*, 345 F.3d 1071, 1078 (9th Cir. 2003) (quoting *Sandin*, 515 U.S. at 484).

As discussed above in connection with Plaintiff's other claims, Plaintiff received multiple RVRs. More specifically, Plaintiff states that he went "man-down" and was taken to the hospital during an incident when Gordian attempted to force him to perform tasks that he was medically restricted from doing. (ECF No. 18, p. 8). This led to Gordian writing him an RVR for refusing to do his assignments. (*Id.*). And she wrote him up in another RVR on a separate day when he tried to present her with documentation that she requested in order to excuse him from his duties. (*Id.*). These RVRs resulted in RVR hearings where Plaintiff alleges that his due process rights were violated. (*Id.*).

Plaintiff's First Amended Complaint also alleges that defendant Ramirez violated Plaintiff's due process rights on April 10, 2023, by denying his request for an investigative employee so he could identify classmates present during the incident at issue to be able to call witnesses. (*Id.*). Similarly, on April 27, 2023, Defendant Guzman denied his request for an investigative employee to identifying witnesses for an RVR proceeding. (*Id.*). Elsewhere, Plaintiff indicates that he would have used an investigative employee to obtain records for his

defense. (*Id.* at 12). Lastly, Plaintiff asserts that Defendant Andrade violated his due process rights on March 17, 2024, by refusing to allow him to call witnesses at an RVR hearing. (*Id.* at 20).

Plaintiff states that he was found guilty "on all three occasions." (*Id.*). As a result of his RVR proceedings he was designated to C-status for 90 days; lost phone, day room, canteen, and package privileges; and obtained "points" which could affect his placement in a higher-level yard and cause him not to be able to qualify for parole or early release. (*Id.* at 4, 16, 20).

Liberally construing Plaintiff's allegations, the Court concludes that Plaintiff has sufficiently stated a claim against Defendants Ramirez, Guzman, and Andrade based on denial of due process in connection with his RVR proceedings.[9]

### F.    Due Process – Personal Property

Plaintiff alleges that his personal property was taken or destroyed without due process.

The Due Process Clause protects prisoners from being deprived of property without due process of law, *Wolff*, 418 U.S. at 556, and prisoners have a protected interest in their personal property, *Hansen v. May*, 502 F.2d 728, 730 (9th Cir. 1974). An authorized, intentional deprivation of property is actionable under the Due Process Clause. *See Hudson v. Palmer,* 468 U.S. 517, 532 n.13 (1984) (citing *Logan v. Zimmerman Brush Co.,* 455 U.S. 422 (1982)); *Quick v. Jones,* 754 F.2d 1521, 1524 (9th Cir. 1985). An authorized deprivation is one carried out pursuant to established state procedures, regulations, or statutes. *Logan*, 455 U.S. at 436; *Piatt v. McDougall,* 773 F.2d 1032, 1036 (9th Cir.1985); *see also Knudson v. City of Ellensburg,* 832 F.2d 1142, 1149 (9th Cir. 1987).  On the other hand, "an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements

---

[9] The Court notes that, if Plaintiff's challenges to his disciplinary proceedings would necessarily affect the duration of his confinement, such claims may be subject to a so-called *Heck* bar. *See Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) (discussing favorable termination rule); *Edwards v. Balisok*, 520 U.S. 641, 646 (1987) (§ 1983 claim not cognizable because allegations of procedural defects and a biased hearing officer implied the invalidity of the underlying prison disciplinary sanction of loss of good-time credits); *cf. Ramirez v. Galaza*, 334 F.3d 850, 858 (9th Cir. 2003) (holding that the favorable termination rule of *Heck* and *Edwards* does not apply to challenges to prison disciplinary hearings where the administrative sanction imposed does not affect the overall length of confinement and, thus, does not go to the heart of habeas).

of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson*, 468 U.S. at 533.

As discussed above in connection with Plaintiff's retaliation claims, he asserts that Dunas and Genseal either lost or damaged his personal property because he complained about other VSP staff. (*Id.* at 7, 13, 17-19). Further, he alleges that Defendant De La Garza stated that he could not get his property because he had filed a grievance. (*Id.* at 13, 18). Plaintiff relies on these same facts to assert a due process violation as to the loss of his property.

However, such allegations only establish an unauthorized intentional deprivation of property. Importantly, by Plaintiff's own telling, the Defendants' conduct concerning his property was based on their reaction to Plaintiff's previous complaints, not due to some authorized prison procedure.

Moreover, "California law provides an adequate post-deprivation remedy in the form of tort claims against public officials." *Strauss v. Cty. of Los Angeles*, No. 19-CV-05277-GW (AFM), 2020 WL 8026143, at *9 (C.D. Cal. Oct. 7, 2020), *report and recommendation adopted*, No. 2:19-CV-05277-GW-AFM, 2021 WL 2808824 (C.D. Cal. July 2, 2021); *see also Barnett v. Centoni*, 31 F.3d 813, 816-17 (9th Cir. 1994) (citing Cal. Gov't Code §§ 810-95) (denying prisoner's due process claim regarding deprivation of property because he had adequate post-deprivation remedy under California law); *McFalls v. Alonzo*, No. 21-cv-849-MMA-RBB, 2021 WL 2577149, at *4 (S.D. Cal. June 23, 2021) ("The California Tort Claims Act ('CTCA') provides an adequate post-deprivation state remedy for the random and unauthorized taking of property.").

Accordingly, Plaintiff fails to state any due process claim in connection with his personal property against any Defendant.[10]

---

[10] Plaintiff's response to the initial screening order argues that his "property was taken from [him] under an authorized prison procedure when an inmate is sent to Restricted Housing Unit." (ECF No. 19, p. 2). Further, he states that no tort remedy is available to him because "the time limitations to file ran out." (*Id.*). These arguments do not change the Court's conclusion that he fails to state a claim. First, although the first amended complaint indicates that Plaintiff's property was temporary packed up while he was sent to administrative segregation, he also clearly alleges that his property was lost because of individual Defendants' decisions, not pursuant to authorized prison procedures. (ECF No. 18, pp. 13, 17) ("It was

\\\

## IV.   CONCLUSION, ORDER, AND RECOMMENDATIONS

The Court has screened Plaintiff's first amended complaint and finds that it states only the following claims: (1) violation of his right to be free from unconstitutional conditions of confinement against Defendant Gordian; (2) retaliation against Defendants Dunas, Genseal, and De La Garza; (3) deliberate indifference to his serious medical needs against Defendants Dr. Shin, Nurse Anderson, Nurse Johnson, Dr. Longia, and Dr. Bansal; and (4) denial of due process against Defendants Ramirez, Guzman, and Andrade.

The Court will recommend that all other claims and Defendants be dismissed without further leave to amend. Notably, the initial screening order addressed materially identical allegations, advised Plaintiff how they were deficient, provided applicable legal standards, and granted him leave to amend. Plaintiff filed a response to the screening order, stating that he mostly wants to proceed on the findings and recommendations (except as to his due process claims regarding his personal property as explained above).

Accordingly, IT IS RECOMMENDED as follows:

1. This case proceed on Plaintiff's First Amended Complaint on the following claims: (1) the violation of Plaintiff's right to be free from unconstitutional conditions of confinement under the Eighth Amendment against Defendant Gordian; (2) retaliation in violation of the First Amendment against Defendants Dunas, Genseal, and De La Garza; (3) deliberate indifference to his serious medical needs in violation of the Eighth Amendment against Defendants Dr. Shin, Nurse Anderson, Nurse Johnson, Dr. Longia, and Dr. Bansal; and (4) denial of due process in violation of the Fourteenth Amendment against Defendants Ramirez, Guzman, and Andrade.

2. All other claims and Defendants be dismissed without further leave to amend.

These findings and recommendations will be submitted to the United States District

---

made clear to me while handcuffed on the way to the hole by Cos Genseal, Dunas and Boyett that this was happening  because I had written so many 602 grievances."). Second, Plaintiff's failure to file a timely tort claim does not mean that the remedy was unavailable to him.

Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1). Within

thirty (30) days after being served with these findings and recommendations, Plaintiff may file

written objections with the Court. The document should be captioned "Objections to Magistrate

Judge's Findings and Recommendations." Any objections shall be limited to no more than

fifteen (15) pages, including exhibits. Plaintiff is advised that failure to file objections within

the specified time may result in the waiver of rights on appeal. *Wilkerson v. Wheeler*, 772 F.3d

834, 838-39 (9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **August 28, 2025**                     /s/ Erica P. Grosjean
                                         UNITED STATES MAGISTRATE JUDGE